IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MICHAEL RHEA DAVIS            )
                             )
        Plaintiff,            )
                             )
    v.                        )        CIVIL ACTION NO. 2:10cv505-SRW
                             )
MICHAEL ASTRUE,               )
Commissioner of Social Security,  )
                             )
        Defendant.            )

## MEMORANDUM OPINION

Plaintiff Michael Rhea Davis brings this action pursuant to 42 U.S.C. § 405(g) and

§ 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security

("Commissioner") denying his applications for a period of disability and disability insurance

benefits and for supplemental security income under the Social Security Act.  The parties

have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C.

§ 636(c).  Upon review of the record and briefs submitted by the parties, the court concludes

that the decision of the Commissioner is due to be reversed.

## BACKGROUND

Plaintiff completed high school in May 1987 and truck driving school in 1990; he

worked as a truck driver from 1990 to 2005.  (R. 137, 142).[1]  On August 16, 2005, the

---

[1]  Plaintiff was treated by Dr. Jeffrey Price of Chilton Family Medicine, his primary care
physician, between February 2000 and January 2009, primarily for diabetes mellitus and
hypertension.  Dr. Price also treated plaintiff for various other medical complaints including a
ureteral stone, dermatitis, tendonitis of right elbow, a sebaceous cyst on his back, conjunctivitis, a
spider bite, flu, and anxiety and depression. (See Exhibits 4F and 11F).  On February 4, 2000,

tractor-trailer that plaintiff was driving was struck from behind by another 18-wheeler which

itself had been rear-ended by another 18-wheeler.  Plaintiff was turned toward the left when

he was hit, and he complained primarily of left shoulder pain and left-sided thoracic back

pain initially.  On August 23, 2005, plaintiff reported to Dr. Sara Walker at Calera Family

Health for evaluation after being involved in a motor vehicle accident the previous week, in

---

plaintiff complained to Dr. Price of left shoulder pain and occasional leg pain. Plaintiff weighed more than 400 pounds. Dr. Price diagnosed obesity and venous stasis changes. He advised plaintiff to lose weight, to stop using salt, and to use an ACE wrap or compression hose when driving his truck. Dr. Price examined plaintiff again the following month. He again noted venous stasis. Plaintiff was on medication for mild diabetes mellitus. Plaintiff returned to Dr. Price in March, April and May 2000 to follow-up on his hypertension and his diabetes mellitus. (R. 228-234). Plaintiff returned to Chilton Family Medicine for lab work in March and June of 2001 and for congestion and cough in December 2001. (R. 223-25). In a physical examination on February 22, 2002, Dr. Price noted that plaintiff's diabetes mellitus was "ok" on his oral medication. However, Dr. Price observed edema in plaintiff's lower extremities with venous insufficiency. (R. 226-27).

On May 13, 2002, after falling through the wooden floor of a trailer the previous evening, plaintiff sought treatment from Dr. Price for pain in his right knee. Plaintiff was still complaining of knee pain ten days later. Dr. Price ordered an MRI but plaintiff could not have the MRI performed as scheduled because he was too large for the machine. On May 31, 2002, plaintiff reported to Dr. David Lindsay of Shelby Orthopedics in Alabaster, Alabama, for evaluation of an injury to his right knee. He reported pain since his fall. Plaintiff's height was 6'1" and he weighed 420 pounds. His x-ray showed no acute injury. Dr. Lindsay diagnosed bursitis of plaintiff's right knee. (R. 221-22, 285).

Sixteen months later, on September 8, 2003, plaintiff saw Dr. Larry Mikul at Calera Family Health, complaining of the acute onset of left knee pain while he was climbing down the stairs of his truck. Dr. Mikul noted that plaintiff's x-rays were essentially normal. A week later, when plaintiff's knee had not improved, Dr. Mikul indicated that plaintiff should see an orthopedist. (R. 186-188). Dr. Price diagnosed morbid obesity on February 25, 2005, noting that plaintiff's weight had increased and that he was not dieting or exercising. (R. 209). On March 25, 2005, Dr. Price wrote that plaintiff was still too heavy for the scale and again diagnosed morbid obesity. (R. 206). Dr. Price continued to diagnose morbid obesity in visits over the next couple of months. (R. 204-205). On June 16, 2005, Dr. Price noted that plaintiff had lost thirty to forty pounds. On July 15, 2005, Dr. Price noted that plaintiff had not lost any weight over the previous month. During that visit, he diagnosed insomnia. He scheduled plaintiff for an appointment with Dr. Cottingham at the Weight Clinic. (R. 202).

which he was hit from behind.  Plaintiff told Dr. Walker that his shoulder was not quite as bad as it had been, but that he was hurting "a little bit" in the right neck and his occipital region. He also reported burning "a little bit" in the lower lumbar region.

On physical examination, Dr. Walker noted that plaintiff's neck had a little tenderness in the occipital region but normal range of motion.  His thoracic area was slightly tender but his lower lumber region was negative.  Dr. Walker assessed back strain and inflammation of the neck. (R. 184; see R. 176, 300, 316). A week later, on August 30, 2005, plaintiff returned to Dr. Walker complaining of continuing right neck pain which caused headache, mid-thoracic pain, and "a little bit of burning in his left lower back."  Plaintiff reported no symptoms in his arms or legs.  Dr. Walker again noted some tenderness in the right occipital region of plaintiff's neck, but normal range of motion.  She indicated that plaintiff's back was non-tender in either the thoracic or the lumbar spine, that plaintiff had a negative straight leg raise bilaterally, and that his muscle strength and reflexes were equal bilaterally.  She noted no evidence of radiculopathy.  Dr. Walker prescribed a stronger muscle relaxer and continued plaintiff on Naprosyn and Lortab.  (R. 182).

Plaintiff returned to Dr. Walker for follow-up on September 7, 2005. On physical examination, Dr. Walker noted that plaintiff's neck was "getting better" with "no tenderness over the musculature."  She observed normal strength and reflexes of plaintiff's upper extremities, a nontender lumbar region, and a negative straight leg raise bilaterally.  She noted some paraspinous tenderness in plaintiff's thoracic spine.  Dr. Walker discontinued the

Lortab due to plaintiff's report that it had not helped and that he did not want further narcotics. She continued him on Naprosyn and changed his muscle relaxer prescription. (R. 180).

On September 15, 2005, plaintiff saw Dr. Martin Jones at the Orthopaedic Sports Medicine Clinic of Alabama in Vestavia Hills, Alabama. Dr. Jones noted tenderness at the base of plaintiff's cervical spine and tenderness to deep palpation of the low lumbar spine, but "[n]o definite paraspinal spasm." He observed that the range of motion of plaintiff's back was about 85% of normal. Dr. Jones determined that plaintiff's lumbar and cervical x-rays revealed only mild degenerative changes but "nothing acute." He assessed cervical and lumbar sprain and referred plaintiff for physical therapy. (R. 175-77). Plaintiff attended physical therapy between September 20, 2005, and October 3, 2005. On discharge from physical therapy, plaintiff reported continued pain on a level of three out of ten "at rest [with] radicular symptoms in [both] feet." Plaintiff was to continue with a home exercise program. (R. 178).

On October 3, 2005, plaintiff returned to Dr. Price, complaining of back and neck pain. He told Dr. Price about his motor vehicle accident and said that Dr. Jones and Calera Family Health had both had x-rays performed which were negative. He stated that, even after physical therapy, he still had increased lower back pain after driving for thirty minutes. Dr. Price diagnosed lower back pain with radiculitis to plaintiff's left lower extremity. He scheduled plaintiff for an MRI, which took place on October 5, 2005. It showed: (1) disc

4

herniation at L5-S1 with marked nerve root impingement and with a disc osteophyte complex also present; (2) facet hypertrophy with bilateral foraminal stenosis and nerve root impingement at L3-4 and L4-5; and (3) annular protruding disc with a central annular tear at L4-5 with mild narrowing of the central canal in addition to the bilateral foraminal stenosis. (R. 201, 314).

On October 14, 2005, Dr. Thomas Francavilla, a neurosurgeon at The Brain and Spine Center in Alabaster, Alabama, examined the plaintiff. Plaintiff reported posterior cervical pain and low back pain radiating down his left leg at times and periodic numbness in his left leg. Dr. Francavilla noted that plaintiff's lumbar MRI showed "degenerative disc disease and foraminal stenosis mildly at L3-4 and L4-5" and, further, "a large herniated disc lumbosacral to the left lateral recess." Dr. Francavilla diagnosed lumbar disc disease with radiculitis and a mild neurologic deficit. (R. 300). Plaintiff returned to Dr. Francavilla on November 1, 2005, reporting continued pain in his low back radiating into his leg. Plaintiff stated that the pain really interfered with his activity quite a bit and he wanted to discuss surgical intervention. Dr. Francavilla explained the risks and benefits of surgery and plaintiff stated that he would like to go forward with surgery. (R. 299).

On November 7, 2005, plaintiff had an MRI of his cervical spine which revealed a small right paracentral annular bulge of the C6-7 disc and straightening of the "usually lordotic curvature, but no disc herniation or foraminal stenosis. (R. 320). On November 17, 2005 plaintiff was evaluated by Dr. Thomas Rigsby at Montgomery Neurosurgical

Associates for a second opinion about surgery, on referral from plaintiff's worker's compensation carrier.  Dr. Rigsby described plaintiff as an "enormous white male with a stated weight of 418 lbs."  He added, "I'm unable to weigh him because our scales do not go that high."  After examining the plaintiff and reviewing his MRI, Dr. Rigsby concluded that surgery was "probably the only thing that [would] help him" with his large disc herniation. Dr. Rigsby wrote:

> However, because of his enormous weight and his other medical problems, I explained to him that he is at a high risk that he may not improve or could have a significant complication.  However, I feel that surgery is the only reasonable option.

(R. 316-20).

Plaintiff next returned to Dr. Francavilla six months later, on May 25, 2006.  He had last reported that his pain had not improved and that he would again like to consider surgical options.  Dr. Francavilla noted reduced range of motion in plaintiff's lumbar spine and that straight leg raising on the left brought on some back and leg pain.  He stated that plaintiff had "[n]ormal station and gait."  Plaintiff again indicated that he would like to proceed with surgery. (R. 298).  Dr. Francavilla referred plaintiff to a cardiologist, Dr. Mark Mullens, for a preoperative evaluation.  Plaintiff reported no breathing problems or dyspnea on exertion, and said that – according to his wife – he was not a loud snorer.  He stated that he did not have known obstructive sleep apnea.  Dr. Mullens stated that plaintiff had a lot of cardiac risk factors, including his obesity, hyperlipidemia and hypertension, but that he was stable and asymptomatic and his EKG was normal.  Dr. Mullens noted that while plaintiff was at

6

a slightly increased risk of complications, he did not believe that the planned surgery was contraindicated.  (R. 191-92).

Dr. Francavilla performed a "minimally invasive diskectomy L5-S-1" on June 12, 2006.  During the surgery he removed some disc material.  However, he observed a large osteophyte complex anterior to the thecal sac and S1 nerve root.  Dr. Francavilla noted, "This was removed somewhat in a piecemeal fashion but not completely. There was still significant compression and I felt the only way to adequately address this would be a decompression, rather extensive, which we are not set up for."  (R. 309).  Bilateral venous duplex imaging conducted the following day to assess plaintiff's right and left lower extremity venous circulation was normal. (R. 304). No significant abnormalities were noted on an echocardiogram performed on the same day.  (R. 305).  While he was in the hospital for his back surgery, plaintiff was evaluated by Dr. H. Andrew Wilson, Jr., who diagnosed "[p]robable obstructive sleep apnea."  Dr. Wilson wrote, "Patient likely has significant sleep apnea and has had witnessed spells during his hospital stay. He also has underlying hypertension and diabetes, which places him at higher risk for such.  (R. 331-32).

Plaintiff saw Dr. John Denney at Dr. Francavilla's office for follow-up on June 22, 2006. He reported some residual pain in his leg but state that his back pain had diminished dramatically.  (R. 297).  Plaintiff saw Dr. Francavilla in a follow-up visit on July 13, 2006. He stated that his radicular pain had resolved, but that he had "good and bad days" as to his midline back pain. Dr. Francavilla wrote, "He has not worked as a truck driver since

September. I think it is unreasonable to have him resume at this point. He needs further conditioning of his spine, and this was discussed. He is no longer taking narcotic analgesics. I will prescribe an anti-inflamatory agent and anti-spasmodic. Follow-up in 4 weeks, and hope to have a return to work situation." (R. 296).

Plaintiff attended physical therapy at Cornerstone Fitness and Wellness between June 23, 2006, and August 1, 2006. He was discharged from therapy at his physican's direction after he experienced no significant change in his pain. (R. 293). On August 3, 2006, plaintiff reported to Dr. Francavilla that he felt that his pain was more constant but less intense. Dr. Francavilla observed that plaintiff "really should be better at this point," and he ordered an MRI (R. 295). The radiologist evaluating the MRI wrote, "[a] large area of recurrent disc herniation with a prominent extruded fragment is noted. This effaces the thecal sac on the left and appears to severely impinge on the left S1 nerve root. The fragment extends into the left S1 foramen producing mild foraminal compromise." (R. 302). Dr. Francavilla's treatment note for an office visit the follow week reads:

> He has pain down his leg which is numb. Imaging was interpreted as a large recurrent disc herniation. I suspect this is the large osteophyte I saw at surgery that I could not remove with a minimally invasive approach. There may be some discs associated with it. His options would be injection therapy vs. open diskectomy to involve probably a hemilaminectomy and extensive dissection and drilling off the osteophyte. He would like to go forth with injection therapy as an alternative, and this is reasonable. A referral will be made to the pain management service.

(R. 294). On August 11, 2006, Dr. Francavilla completed a form for plaintiff's worker's compensation manager, indicating that plaintiff had reached maximum medical improvement

8

as of that date with a permanent partial impairment of 10% of his whole body. Dr. Francavilla released plaintiff from further medical care.  (R. 291-292).

On August 15, 2006, Dr. Thomas Kraus of Pain Management Services evaluated plaintiff.  He recommended "one therapeutic injection to see if he can get some relief." Plaintiff told Dr. Kraus that walking, standing and increasing his activities over five to ten minutes causes him to have significant radicular pain and that sitting makes his pain better. Plaintiff rated his pain as a level six to seven on a scale of ten.  Dr. Kraus noted pain on flexion and deflexion of plaintiff's lumbosacral spine, a straight leg raise to forty-five degrees, and decreased strength to the extensor hallucis longus. Dr. Kraus observed that plaintiff ambulated with a limp to the left lower extremity.  (R. 345).

Plaintiff returned to Dr. Francavilla on September 7, 2006, reporting that he was still having back and leg pain. Dr. Francavilla wrote:

> Unfortunately, he cannot fit on the table for a block locally.  He was sent to Brookwood for one and it has not been scheduled yet. His pain remains the same. I think a block is reasonable, and if he fails to improve, he may need permanent pain management. I do not really want to encourage further surgical intervention given his morbid obesity.

(R. 290; see also R. 301). The following month, on October 9, 2006, plaintiff complained to Dr. Price of right knee pain lasting for one week.  (R. 196). On January 10, 2007, Dr. Thomas Kraus administered a lumbar epidural injection to address plaintiff's lumbar pain.  (R. 324-325).

Two weeks later, on January 24, 2007, plaintiff filed applications for a period of

9

disability and disability insurance benefits and for supplemental security income, alleging disability since August 28, 2005, because of his herniated disc and his diabetes. (R. 82-83, 108-15, 131, 136). On March 6, 2007, Dr. Gregory Parker, a non-examining agency physician, completed a residual functional capacity form. He concluded that plaintiff is capable of performing light work exertionally with postural limitations. (Exhibit 9F, R. 349-356). Plaintiff's claims were denied at the initial administrative level on March 7, 2007, and plaintiff requested a hearing before an ALJ. (R. 92-97).

Plaintiff next returned to Dr. Kraus on November 6, 2007, ten months after his previous visit, to begin "medicine management clinic" for his complaints of low back and left leg pain. Dr. Kraus noted paraspinal muscle spasm, pain with flexion and deflexion, left radicular pain, diminished but symmetrical reflexes, decreased strength to the extensor hallucis longus, and that plaintiff ambulated with a limp. He prescribed medication and scheduled plaintiff for follow-up in three months. (R. 367). On November 27, 2007, plaintiff returned to Dr. Kraus, reporting that he had stopped taking Lortab due to nausea and vomiting. (R. 366). On December 31, 2007, plaintiff returned to Dr. Kraus for follow-up. Dr. Kraus noted, "Overall he is doing well with no significant side effects." Plaintiff stated that the Oxycodone was giving him "significant benefit and relief." Plaintiff reported that he was taking this medication on an "as needed" basis and had not taken any over the last two to three days. Dr. Kraus again noted pain with flexion and deflexion, and left radicular pain at the L5 nerve root with paraspinal muscle spasms. Dr. Kraus assessed "[f]ailed back

surgery with radiculopathy." Dr. Kraus wrote, "He states he has medications left; therefore we will not fill his medications until he states he runs out. He is taking this sporadically." (R. 365).

On January 29, 2008, plaintiff returned to Dr. Kraus to get another Oxycodone prescription. He told Dr. Kraus that he was doing well with no significant side effects and that he continued to take his Oxycodone on an "as needed" basis. On physical examination, plaintiff had pain with flexion and deflexion and paraspinal muscle spasms, but he had no radicular pain. (R. 364). Plaintiff was a "no show" for a pain management appointment scheduled for April 22, 2008. (R. 357). On May 13, 2008, plaintiff reported a pain level of three on a scale of ten. He was taking 10 milligrams of Percocet. He reported that his activities of daily living were unchanged and that he was not experiencing any side effects from his pain reliever. (R. 363). On August 5, 2008, plaintiff returned to Dr. Kraus. His chief complaints were low back pain and knee pain. He reported that he was doing well overall with no significant side effects and no significant problems on that day. He had pain on range of motion of his knee, a limp, pain on flexion and deflexion, paraspinal muscle spasm to the low back, and radicular pain. (R. 362). Plaintiff returned to Dr. Kraus for follow-up on November 11, 2008. He complained of aching, burning and catching in his lower back and some knee pain. He rated his pain as five on a scale of ten. He reported that his symptoms worsen with activity or exertion, bending, exercise, or lifting, and that they improve with rest. On physical examination, he had quadricep and hamstring strength of 3/5,

mild pain on palpation from the midline to the lateral aspect of his patella, and moderate tenderness at the lateral aspect of the patella.  Plaintiff had full range of motion of his lumbar spine with mild to moderate pain and myofascial spasms. (R. 358-361). On January 26, 2009, Dr. Price diagnosed plaintiff with acute gout in his feet. (R. 368).

On March 10, 2009, an ALJ conducted an administrative hearing, during which he heard testimony from the plaintiff and from a vocational expert. (R. 24-62).  Plaintiff testified as follows: He can lift "maybe 5, 10 pounds." His leg gets numb and his knee will "give out." He has to change positions constantly to ease his pain. He can sit for about five minutes or stand for about five minutes before he has to change positions.  He can walk about thirty or forty yards. He had to surrender his commercial driver's license because of his insulin dependence and may lose his regular license for the same reason. His blood sugar levels remain too high. He has constant swelling and numbness in his lower leg and he has high blood pressure.  With medication, his low back pain is at a level of four to seven on a scale of ten.  Without medication, "it just goes through the roof." He has sleep apnea but has not had a sleep study.  He gets about one or two hours of uninterrupted sleep; when he wakes up, he has to get up and sit in a chair due to his back pain.  He spends about twenty hours each day in the chair and goes to his bed about three times a day.  He has arthritis in his shoulders and torn tendons in the two middle fingers of his left hand.  He no longer has problems with his left knee. He has back pain that radiates down his left leg and "every now and then" down his right leg. His pain medication makes him nauseous so that he has to go to bed after he

takes it. He naps off and on all day, and believes it is partially due to sleep apnea and partially because of his pain medication.  He takes Percocet three times a day and it makes his pain tolerable.

He is 6'2" and weighs "about 420" pounds.  He watches a little television during the day and sometimes plays games on his computer, but he does not do chores. He has migraines once a week that sometimes last all day. His gout attacks clear up within a few days after he gets a shot. He limps due to back pain, favoring his left leg. He can bend a little and squat a little but cannot stoop.  He has painful muscle spasms every other day.  He is able to go grocery shopping with his wife, but they try not to stay more than twenty or thirty minutes. He does not have insurance but has lifetime medical care for his back through worker's compensation.  Dr. Price gave him medications for depression for a while but, while Dr. Price might start plaintiff on the medications again, he is not medication for depression currently. Because of the depression, he just wants to stay in the house and not talk to anybody. He seldom visits friends or family and last did so the previous Friday. He drove the 45 or 50 miles to the hearing but had to stop twice on the way and get out of the car.  (R. 30-53).

The ALJ issued a decision on May 6, 2009. He found that plaintiff has severe impairments of "degenerative disc disease, lumbar spine, lumbar radiculitis, status post lumbar diskectomy; recurrent herniated disc L5-S1; obesity; diabetes mellitus; and sleep apnea." (R. 14). The ALJ determined that plaintiff has non-severe impairments of headaches,

hypertension, gout, and depression, and that he does not have an impairment or combination of impairments that meets or medically equals the listings. (R. 14-15). The ALJ determined that plaintiff retains the residual functional capacity to perform sedentary work and that, while he cannot perform his past relevant work, there are jobs existing in significant numbers in the national economy that plaintiff can perform. (R. 15, 21-22). Accordingly, the ALJ determined that plaintiff was not under a disability as defined in the Social Security Act from his alleged onset date through the date of the decision. (R. 22). On April 15, 2010, the Appeals Council denied plaintiff's request for review.  (R. 1-4).

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings.  Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails

14

to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

Plaintiff argues that the ALJ failed to assess plaintiff's credibility properly in that he failed to address the third prong of the Eleventh Circuit pain standard – *i.e.*, whether plaintiff's impairments could reasonably be expected to produce the pain he alleged – and also failed to state reasons, supported by substantial evidence, for rejecting plaintiff's allegations of pain.  (Plaintiff's brief, pp. 8-12).  Plaintiff further contends that the ALJ erred by failing to give proper consideration to the effects of plaintiff's obesity.

### The Credibility Assessment

In the Eleventh Circuit, a claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard. "The pain standard requires '(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005)(quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)).  If this standard is met, the ALJ must consider the testimony regarding the claimant's subjective symptoms.  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992).  After considering the testimony, the ALJ may reject the claimant's subjective complaints. However, if the

15

testimony is critical, the ALJ must articulate specific reasons for rejecting the testimony.  Id. "A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).[2]  "The credibility determination does not need to cite ""particular phrases or formulations'" but it cannot merely be a broad rejection which is '"not enough to enable [the court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole.""" Dyer, supra, 395 F.3d at 1210 (citations omitted).

Plaintiff contends that "there is no analysis in the [ALJ's] decision either directly or inferred as to whether the claimant's degenerative disc disease and large herniated disc with severe nerve root impingement could reasonably be expected to produce the pain he described," and that the ALJ's complete failure to consider the third prong of the Eleventh Circuit pain standard is clear error that warrants reversal. (R. 10). However, the ALJ

---

[2] See also Social Security Ruling 96-7p, 61 Fed. Reg. 34483-01 (July 2, 1996):

When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

*expressly* concluded "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms" (R. 20) – *i.e.*, that the third prong of the Eleventh Circuit pain standard was satisfied.  This allegation of error is without merit.

Plaintiff further contends that the ALJ failed to state reasons, supported by substantial evidence, for rejecting plaintiff's allegations of pain.[3]  The court finds the ALJ's decision to discount plaintiff's testimony to be minimally adequate. He stated at least one specific reason – *i.e.*, that plaintiff's "use of medication does not suggest the presence of any impairment(s) which is more limiting than found in this decision."  (R. 21).  The ALJ's failure to cite the evidence in support of this stated reason within his credibility analysis is not the best practice, and it needlessly complicates review.[4]  However, it is apparent from the decision as a whole that the ALJ here refers to plaintiff's sporadic use of narcotic pain medication, described fully within the ALJ's summary of the evidence and supported by evidence of record.  See R. 18 (describing treatment notes from Dr. Kraus in December 2007 that plaintiff was taking Oxycodone "only as needed and had not taken any over the past two to three days," in

---

[3]  Plaintiff's allegation of error as to the credibility determination is directed entirely to plaintiff's complaints of disabling pain. (Plaintiff's brief, pp. 9-10).  The Commissioner's response addresses the argument advanced by plaintiff.  Accordingly, the court does not discuss whether the ALJ's credibility determination is adequate as to plaintiff's other subjective complaints.

[4]  See Tauber v. Barnhart, 438 F.Supp.2d 1366, 1380 (N.D.Ga. 2006)("While it is apparent that the ALJ perceives a conflict between Claimant's testimony and the objective medical evidence, that conflict is not explained. In order to examine whether the ALJ's decision to discredit Claimant's testimony is supported by substantial evidence, as this Court is tasked to do, the ALJ must, at least, provide a record that indicates what the conflict is and how that conflict affected his credibility determination.").

January 2008 that he still took Oxycodone on an "as needed basis . . . approximately one a day on a sporadic basis" and in August 2008 that "[u]rine drug screen was negative for opiates which was appropriate for him"); see also Exhibit 10F, R. 362-65.  Accordingly, the court finds without merit plaintiff's contention that the ALJ's credibility determination is flawed as to his testimony of disabling pain.

Effects of Obesity

Social Security Ruling 02-01p sets forth the Commissioner's policy regarding the evaluation of obesity in disability claims. The Ruling states, in part:

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. As explained in SSR 96-8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"), our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.

> The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

*   *   *   *   *

> *As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations.*

SSR 02-01p, Titles II and XVI: Evaluation of Obesity (footnote omitted)(emphasis added).

18

Plaintiff argues that "the ALJ failed to explain how he reached his conclusions on the effects of [plaintiff's] obesity." Plaintiff points to his hearing testimony that he is sleepy during the day and takes frequent naps, and to Dr. Wilson's diagnosis – accepted by the ALJ – of probable sleep apnea. He notes Dr. Wilson's observation that he "likely has significant sleep apnea and has had witnessed spells during his hospital stay." He contends that "[c]areful study of the ALJ's decision fails to reveal explanation or mention of the evidence upon which he relied to find that the claimant's obesity was not a contributing factor in the claimant's ... inability to function on a daily basis as described by the claimant in his testimony." (Plaintiff's brief, pp. 12-14). The Commissioner responds:

> Plaintiff's argument that the ALJ ignored the effects of his obesity also lacks merit. The ALJ explicitly considered Plaintiff's obesity in the hearing decision. He recognized that Plaintiff weighed 420 pounds (Tr. 17, 19), and that Plaintiff's physicians considered him morbidly obese (Tr. 17, 18). He found obesity and sleep apnea (a consequence of his obesity) were severe impairments, and noted that Plaintiff was not using a CPAP machine for sleep apnea (Tr. 14, 19). The ALJ also recognized that SSR 02-01p required him to consider the effects of Plaintiff's obesity on his functional capacity.
>
> Although the ALJ did not describe in specific terms how Plaintiff's obesity increased his functional limitations, it is apparent that he considered obesity in finding he could perform only a limited range of sedentary work.

(Commissioner's brief, p. 12).

As the Commissioner notes, the ALJ included – in his recitation of the medical evidence – the plaintiff's weight and his physicians' diagnoses of morbid obesity (R. 17, 18), and found both obesity and sleep apnea to be severe impairments (R. 14). The ALJ also stated, in recounting plaintiff's hearing testimony, "He has sleep apnea but does not use a

CPAP machine. He has not had the test. Workers compensation would not pay for that... . He sleeps off and on all day. This is because of the medication and sleep apnea." (R. 19). In his analysis, the ALJ wrote:

> I have also considered the impact of the claimant's obesity in exacerbating his problems and functional limitations caused by his other impairments. We are instructed that an assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. "In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea." Furthermore, the combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pa[i]n and limitation than might be expected from the arthritis alone. (Social Security Ruling 02-01p).

(R. 20). The ALJ did not further discuss plaintiff's obesity or sleep apnea.

The ALJ acknowledged plaintiff's obesity, recited the requirements of SSR 02-01p, and stated expressly that he had considered the impact of plaintiff's obesity on his functional limitations. However, as the Commissioner acknowledges, "the ALJ did not describe in specific terms how Plaintiff's obesity increased his functional limitations[.]" (Commissioner's brief, p. 12). The Commissioner suggests that "it is apparent that [the ALJ] considered obesity in finding he could perform only a limited range of sedentary work." (Id.). In some instances, the ALJ's rationale might be obvious from the entirety of the decision, even in the absence of an express explanation of how the ALJ reached his conclusion. This is not such a case. Particularly in view of the ALJ's finding that plaintiff

suffers from a severe impairment of sleep apnea, the court is unable to determine "how [he] reached [his] conclusions on whether obesity caused any physical or mental limitations." (See SSR 02-01p). In concluding that plaintiff suffers from a "severe" impairment of sleep apnea, the ALJ necessarily determined that plaintiff's sleep apnea – which the Commissioner acknowledges is "a consequence of his obesity"[5] – "significantly limits [his] physical or mental ability to do basic work activities."  See 20 C.F.R. §§ 404.1520(c), 404.1521; Raduc v. Commissioner of Social Security, 380 Fed. Appx. 896, 898 (11th Cir. 2010)("By definition, a severe impairment limits significantly a claimant's ability to do basic work activities.")(citation omitted). The court is unable to determine – either within the ALJ's limited references to plaintiff's obesity or elsewhere in the decision – what he found plaintiff's sleep-apnea-related significant limitations to be.[6]

The court's review is complicated by the fact that the ALJ's RFC determination does

---

[5]  Commissioner's brief, p. 12.

[6]  The Commissioner argues that "[n]either Dr. Parker [the non-examining agency physician] nor any other physician stated that Plaintiff had additional limitations due to his obesity" and, therefore, that "even if the ALJ erred by failing to state the specific effects of Plaintiff's obesity on his residual functional capacity, the error was harmless."  (Commissioner's brief, p. 13). However, Dr. Wilson determined that plaintiff "likely has significant sleep apnea" and that his "underlying hypertension and diabetes ... place[] him at higher risk for such."  (R. 332). He recommended polysomnography, "particularly given his occupation as a truck driver." (Id.).  The Commissioner observes that plaintiff's sleep apnea is "a consequence of his obesity." (Id., p. 12).  Dr. Wilson's comments suggest work-related limitations due to sleep apnea; the ALJ's finding that plaintiff's sleep apnea is a severe impairment establishes that this is so. The court further notes that, in reaching his conclusions regarding plaintiff's physical capacity, Dr. Parker did not mention or address the sleep apnea found by the ALJ to be a severe medically determinable impairment. (See R. 348-56). Accordingly, the court cannot agree with the Commissioner's "harmless error" argument.

not expressly include *any* non-exertional limitations. See R. 15, Finding No. 5 ("After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a)."). It is apparent that the ALJ intended to include non-exertional limitations, as he indicated that plaintiff's "ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations" and relied on vocational expert testimony to support his "step five" finding that plaintiff can perform other work that exists in significant numbers in the national economy.  (R. 22). However, the ALJ did not state the nature of those additional limitations at any point in his written decision.[7]  The court cannot determine

---

[7]  The Commissioner acknowledges that this is error.  He invites the court to find it harmless, however, noting that the plaintiff does not raise the issue and that the jobs identified by the ALJ in his step-five analysis match those identified by the vocational expert in response to the ALJ's hypothetical question at the hearing.  (Commissioner's brief, pp. 12-13 and p. 13 n. 5). The Commissioner's argument has some merit – it is probable that the ALJ intended to include in his RFC assessment the limitations he stated in his hypothetical question to the vocational expert  (R. 54-57) and plaintiff does not raise the issue specifically.  However, even though plaintiff did not expressly raise the issue of the ALJ's failure to include non-exertional limitations in his RFC finding, his obesity/sleep apnea argument requires that the court identify and evaluate the limitations found by the ALJ to exist. Additionally, courts have had occasion to compare the limitations stated in an ALJ's findings with those included in the ALJ's hypothetical question to a vocational expert and have found them to differ.  See *e.g.*, Dial v. Commissioner of Social Security, 403 Fed. Appx. 420 (11th Cir. 2010); Pendley v. Heckler, 767 F.2d 1561 (11th Cir. 1985); Brenem v. Harris, 621 F.2d 688 (5th Cir. 1980). The court cites these cases not to indicate that the ALJ's hypothetical question to the VE did not include all of the limitations found by the ALJ to exist in this case but, instead, only to illustrate that the limitations found by an ALJ to exist do not always match the limitations included in the ALJ's hypothetical question to a vocational expert, even where the ALJ relies on the VE's testimony to support a "step five" finding. The court declines to infer that the ALJ's RFC finding includes all of the limitations (and only the limitations) he included in his hypothetical question to the VE, and further declines the Commissioner's invitation to treat the ALJ's RFC finding as a harmless "deficiency in opinion-writing."

from the ALJ's decision that the ALJ found the plaintiff's obesity and sleep apnea to impose only exertional limitations (since he referenced additional non-exertional limitations), nor can the court find any explanation regarding the nature and extent of plaintiff's obesity-related limitations, particularly as they relate to plaintiff's sleep apnea. [8]  Because the ALJ failed to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the Commissioner's decision is due to be reversed.  Cornelius, 936 F.2d at 1145-46.

### CONCLUSION

For the foregoing reasons, the decision of the Commissioner is due to be REVERSED and this action REMANDED to the Commissioner for further proceedings. A separate judgment will be entered.

DONE, this 31st day of August, 2011.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[8] In his second hypothetical question to the VE, the ALJ added a limitation to "simple routine tasks involving no more than simple short instructions, simple work related decisions with few work place changes."  (R. 55).  Even if the court were to find that the ALJ's RFC finding implicitly included the limitations he expressed in his hypothetical question to the VE, it is not apparent that this is the limitation found by the ALJ to result from plaintiff's sleep apnea, either apart from or in combination with pain resulting from his other impairments.  See R. 60 (VE's statement that "I thought my last two hypotheticals covered the pain issue and it's really, I mean, if there's anything else that, in terms of that, should take care of it.").